STATE OF CONNECTICUT *v.* LESLIE JONES
(13523)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued February 27—decision released May 29, 1990

*Susan M. Hankins,* assistant public defender, for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

GLASS, J. The defendant, Leslie Jones, was found guilty by a jury of kidnapping in the first degree, in violation of General Statutes § 53a-92 (a) (2) (A).[1] On August 26, 1988, the court sentenced him to a term of twenty-five years imprisonment. The defendant now claims on appeal: (1) that § 53a-92 (a) (2) (A), prohibiting kidnapping in the first degree, is, under the circumstances of this case, unconstitutionally vague, and thus violates his right to due process; (2) that the evidence submitted in this case was insufficient to sustain a con-

---

[1] "[General Statutes] Sec. 53a-92. KIDNAPPING IN THE FIRST DEGREE. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

viction of the crime of kidnapping in the first degree; (3) that the state's use of the defendant's post-*Miranda* refusal to sign his transcribed statement violated his constitutional rights; and (4) that the trial court erred in admitting a portion of his statement that was irrelevant and unduly prejudicial. We find no error.

The jury could reasonably have found the following facts. At approximately 10 a.m. on July 19, 1987, the victim was jogging through Edgewood Park in New Haven. In particular, she was running down the center of a two car-widths wide paved road that runs through the park. While she was running on a portion of the road that passed through a heavily wooded area, she noticed the defendant walking toward her on the road. As they approached each other, the victim adjusted her position to pass the defendant on the left, attempting to leave "plenty of space" between the two of them as she passed.

As the defendant and the victim were about to pass each other, however, the defendant suddenly blocked the victim's path. He grabbed her by the shoulders and said: "Come here, I want to show you something." The victim started screaming, hoping that someone in the park would hear her, but no one was in the immediate area. The defendant then began dragging the victim off to the right side of the road. Once they were off the road, the defendant threw the victim down to the ground in a grassy area. The defendant pinned her down with one hand, and attempted to stuff a white cloth into her mouth with the other hand. His hand was locked around her jaw in such a manner that she "thought he was trying to rip [her] jaw off," and she "felt as if [she] was being smothered because [the cloth] was being pressed right on [her] nose and mouth." The victim began twisting her head back and forth "trying to struggle out of his grasp," and, at some point, the defendant raised his hand as if he were about to

strike her. As the defendant was leaning over her body, however, the victim, who was on her back, coiled her legs up to her chest and kicked him in his stomach. As a result, the defendant lost hold of her. The victim was able to roll out from under the defendant and she began to run away. After running approximately thirty feet, the victim turned and saw that the defendant was not giving chase. She ran out to Edgewood Avenue, where she reported the incident to Sergeant Edward Saccavino of the New Haven police department, who happened to be parked nearby.

Saccavino immediately broadcast the victim's description of her assailant over the radio. Detective Ralph Dinello, who was patrolling the Edgewood Avenue area, heard the broadcast, and a few minutes later spotted the defendant, who matched the description, walking in the vicinity of the park. Dinello approached the defendant and asked him where he lived and from where he was coming. The defendant replied that he lived at 249 Whalley Avenue, and was coming from a friend's house. Dinello was then informed by another officer, who had arrived on the scene, that there was no residence at 249 Whalley Avenue. The defendant then asked why he was being stopped, and Dinello told him that there was an incident in Edgewood Park and that he fit the description of the assailant. The defendant stated that he "was not at Edgewood Park or anywhere near Edgewood Avenue Park" and that he was coming from Whalley Avenue. By this time, Saccavino had arrived with the victim, who stated that she was at least 60 percent sure that the defendant was her assailant.

The defendant was then placed under arrest, given his *Miranda*[2] warnings and taken to the New Haven

[2] See *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

police station. At the station, the defendant was again given his *Miranda* warnings prior to being interrogated by Dinello. In response to Dinello's questions, the defendant again stated that he knew absolutely nothing about the incident and that he was not in the park. When Dinello stopped interviewing the defendant in order to speak with the victim, Sergeant Melvin Wearing asked Dinello if he could speak with the defendant for a few minutes. After speaking with Wearing, the defendant agreed to give a statement to Dinello concerning the incident. In his statement, which was tape recorded, the defendant admitted that he had encountered the victim in Edgewood Park. He claimed, however, that he had merely "staggered" into the victim and that he was attempting to say "excuse me" when she began screaming. He denied having grabbed the victim at all, and claimed that he first denied being anywhere near Edgewood Park because he "was afraid of what that lady may [have] thought."

As a result of the attack, the victim immediately noticed a number of scrapes and bruises. The morning after, she felt pain in her jaw, neck and back. In addition, she discovered bruises on her face, shoulders and chest. The victim then went to be examined by a physician's assistant, Kelly Ann Martens, who testified[3] at trial regarding numerous injuries that the victim had sustained, including an abrasion on her elbow, muscle tenderness in many parts of her body, and an abnormal "click" in her jaw. Martens then referred the victim to a physician concerning her particular injuries, and provided the victim with a cervical collar to wear after leaving the examination.

I

The defendant first claims that General Statutes § 53a-92 (a) (2) (A) is, under the circumstances of this

---

[3] Martens' videotaped testimony was played at trial.

case, unconstitutionally vague. We disagree. In particular; § 53a-92 (a) (2) (A) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and when . . . he restrains the person abducted with intent to . . . inflict physical injury upon him . . . ." General Statutes § 53a-91 (1)[4] defines "restrain" in part as follows: " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved . . . ."

In charging the jury, the trial court limited its definition of "restrain" to moving "from one place to another." The defendant now claims that, in using the phrase "from one place to another," the legislature "has provided an impermissibly vague standard which allows an offense involving any movement at all to be prosecuted as a kidnapping and elevated to the level of [a class] A felony." The defendant asserts further that the lack of precision in this phrase allows a "gross distortion of lesser crimes" into much more serious crimes "by excess of prosecutorial zeal," thus permitting the "absurd and unconscionable" result reached in this case.

---

[4] "[General Statutes] Sec. 53a-91. DEFINITIONS. The following definitions are applicable to this part:

"(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (a) deception and (b) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement."

First, before reaching the merits of the defendant's claim, we must consider the threshold question of reviewability. The state maintains that the defendant's vagueness claim is not reviewable because it was not distinctly raised at trial. We conclude that, despite this procedural default, the defendant's claim of unconstitutional vagueness falls within the parameters of *State v. Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and *State v. Evans,* 165 Conn. 61, 69, 327 A.2d 576 (1973), and therefore warrants appellate scrutiny. See *State v. Schriver,* 207 Conn. 456, 459, 542 A.2d 686 (1988).

Turning to the merits of the defendant's vagueness challenge: "The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974); *Mitchell v. King,* 169 Conn. 140, 142–43, 363 A.2d 68 (1975)." *State v. Schriver,* supra, 459–60. "In order to surmount a vagueness challenge, 'a statute [must] afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited.' *McKinney v. Coventry,* 176 Conn. 613, 618, 410 A.2d 453 (1979). The constitutional requirement of definiteness applies more strictly to penal laws than to statutes that exact civil penalties. *Winters v. New York,* 33 U.S. 507, 515, 68 S. Ct. 665, 92 L. Ed. 840 (1948)." *State v. Schriver,* supra, 460.

Furthermore, it is well established that, as a general rule, "the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue. *United States v. Powell,* 423 U.S. 87, 92, 96 S. Ct. 316, 46 L. Ed. 2d 228 [1975]; *United States v. Mazurie,* 419

U.S. 544, 550, 95 S. Ct. 710, 42 L. Ed. 2d 706 [1975]; *United States* v. *National Dairy Products Corporation,* 372 U.S. 29, 32–33, 83 S. Ct. 594, 9 L. Ed. 2d 561 [1963]; *United States* v. *Raines,* 362 U.S. 17, 21, 80 S. Ct. 519, 4 L. Ed. 2d 524 [1960]." *State* v. *Pickering,* 180 Conn. 54, 57, 428 A.2d 322 (1980). "For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. *State* v. *Proto,* 203 Conn. 682, 696, 526 A.2d 1297 (1987)." *State* v. *Schriver,* supra, 461.

Thus, we must examine the defendant's claim of unconstitutional vagueness within the parameters of the facts of this case. Although we can conceive of factual situations in which charging a defendant with kidnapping based upon the most minuscule movement would result in an "absurd and unconscionable" result; *People* v. *Adams,* 389 Mich. 222, 232, 205 N.W.2d 415 (1973); we conclude that the facts of this case do not present such a situation. Specifically, we conclude that this defendant clearly moved his victim "from one place to another" pursuant to §§ 53a-91 (1) and 53a-92 (a) (2) (A). The victim was jogging down the center of the road through the park. Upon seeing the defendant, she moved to the left of the road. The defendant then grabbed her and dragged her to the right until she was completely off the road. Photographs of the road where the victim was attacked indicate that it was two car-widths wide and surrounded on both sides by a heavily wooded area.[5] In sum, we conclude that the victim was clearly moved "from one place to another," and therefore § 53a-92 (a) (2) (A) is not unconstitutionally vague under the facts of this case.

---

[5] These photographs were introduced into evidence at trial as state's exhibits.

## II

Next, the defendant argues that the evidence submitted in this case was insufficient to sustain a conviction of kidnapping in the first degree. Specifically, the defendant asserts that the state failed to prove that he moved the victim from one place to another, and failed to prove that the victim was abducted with the intent to inflict physical injury upon her as required under § 53a-92 (a) (2) (A). We are not persuaded.

"When a verdict is challenged because of insufficient evidence, the issue is whether ' " 'the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt.' " ' *State* v. *Braxton,* 196 Conn. 685, 691, 495 A.2d 273 (1985), quoting *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). Appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task: We must first review the evidence construing it in the light most favorable to sustaining the trial court's verdict. *State* v. *Williams,* 205 Conn. 456, 468, 534 A.2d 230 (1987); *State* v. *Vincent,* 194 Conn. 198, 206, 479 A.2d 237 (1984); *State* v. *D'Antuono,* 186 Conn. 414, 421, 441 A.2d 846 (1982); *State* v. *Perez,* 182 Conn. 603, 606, 438 A.2d 1149 (1981). ' " 'We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . .' " ' *State* v. *Plourde,* 208 Conn. 455, 458, 545 A.2d 1071 (1988), quoting *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987), and cases cited therein." *State* v. *Avis,* 209 Conn. 290,

308–309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989).

As noted in part I of this opinion, the jury could reasonably have concluded that, by dragging the victim across the road and onto a grassy patch off the road, the defendant moved the victim from one place to another. Furthermore, the jury could reasonably have concluded that the defendant intended to inflict physical injury upon the victim. Specifically, " '[i]ntent may be, and usually is, inferred from conduct.' " *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977); *State* v. *Cofone,* 164 Conn. 162, 164, 319 A.2d 381 (1972). In this case, the jury could reasonably have concluded that the defendant intended to inflict physical injury upon the victim by: (1) dragging her off the road; (2) throwing her down to the ground; (3) pinning her down with one hand while locking his hand around her jaw in such a way that she "thought he was trying to rip [her] jaw off"; (4) pressing a cloth up against her nose and mouth in such a way that she "felt as if [she] was being smothered"; and (5) raising his hand as if he were about to strike her.

In sum, the jury could reasonably have concluded that the evidence presented in this case established guilt beyond a reasonable doubt.

### III

The defendant also argues that the state's use of his post-*Miranda* refusal to sign his transcribed statement violated his constitutional rights. Despite the defendant's failure to voice an objection at trial, this claim is reviewable under *State* v. *Evans,* supra, and *State* v. *Golding,* supra. See *State* v. *Hull,* 210 Conn. 481, 486, 556 A.2d 154 (1989); *State* v. *Plourde,* supra, 462. In particular, the defendant argues that the prosecutor's reference to his failure to sign his statement constituted a violation of his right to remain silent and his

right to due process as guaranteed by the fifth and fourteenth amendments to the United States constitution. We agree.

Specifically, on the day of his arrest, the defendant gave a tape recorded statement to Dinello in which he claimed that he did not attack the victim, but rather, accidently "staggered" into her. The statement was transcribed overnight, and the next day Dinello again met with the defendant. Dinello advised the defendant of his rights and the defendant signed "an acknowledgement of his rights." At this point, however, the defendant refused to sign his transcribed statement. During closing argument, the prosecutor twice made reference to the defendant's failure to sign his statement. Specifically, in an attempt to impeach the defendant's statement, the prosecutor, after denigrating the statement in its particulars, stated: "[A]nd when [the statement] is ultimately transcribed, he won't sign it." Later, while contrasting the credibility of the victim with that of the defendant, the prosecutor stated: "I think it's also interesting to note that you have two versions, one on tape and one on a written statement, or a transcribed statement by [the victim], and it's a signed statement as the truth. The defendant was not willing to sign his version as the truth."

In *Doyle* v. *Ohio,* 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), "the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding in two considerations: First, it noted that silence in the wake of *Miranda* warnings is 'insolubly ambiguous' and consequently of little probative value. Second and more important, it observed that 'while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who

receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.' " *State* v. *Plourde,* supra, 465–66; see *Wainwright* v. *Greenfield,* 474 U.S. 284, 290–92, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986).

In the present case, the defendant had been arrested and had received his *Miranda* warnings when he chose not to sign his statement. He thus clearly manifested his exercise of his right to remain silent. See *United States* v. *Valencia,* 773 F.2d 1037, 1040 (9th Cir. 1985) (declining to sign a *Miranda* waiver form is equivalent to an assertion of the right to silence); *Coppola* v. *Powell,* 878 F.2d 1562, 1564–65 (1st Cir. 1989) (invocation of right to remain silent must be given liberal construction); *Ullmann* v. *United States,* 350 U.S. 422, 426, 76 S. Ct. 497, 100 L. Ed. 511 (1956) (right to remain silent must "not be interpreted in a hostile or niggardly spirit"). Accordingly, the prosecutor's use of the defendant's silence to impeach his statement was "fundamentally unfair and a deprivation of due process . . . ." *Doyle* v. *Ohio,* supra, 618; see *State* v. *Plourde,* supra, 468.

Having concluded that the prosecutor's use of the defendant's failure to sign his statement was error, we must next consider whether such error was harmful. When error is of constitutional dimension, the state has the burden of proving it harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24–26, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967); *State* v. *Green,* 207 Conn. 1, 9, 540 A.2d 659 (1988). "The test for harmfulness is whether 'there is a reasonable possibility that the improperly admitted evidence contributed to the conviction . . . .' *Schneble* v. *Florida,* 405 U.S. 427, 432, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972); *State* v.

*Hoeplinger,* 206 Conn. 278, 294, 537 A.2d 1010 (1988); *State* v. *Shifflett,* 199 Conn. 718, 751–52, 508 A.2d 748 (1986). ' "The harmlessness of an error depends upon its impact on the trier and the result, not upon whether the particular evidence involved was legally essential to support the finding." ' *State* v. *Hoeplinger,* supra, 295 . . . . " *State* v. *Hull,* supra, 492.

" 'A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's postarrest silence does not constitute reversible error.' *State* v. *Silano,* 204 Conn. 769, 781, 529 A.2d 1283 (1987). ' "The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the 'jugular' of the defendant's story." ' Id.; *United States* v. *Davis,* 546 F.2d 583, 594 (5th Cir.), cert. denied, 431 U.S. 906, 97 S. Ct. 1701, 52 L. Ed. 2d 391 (1977); *State* v. *Pellegrino,* 194 Conn. 279, 292, 480 A.2d 537 (1984); *State* v. *Zeko,* 177 Conn. 545, 555, 418 A.2d 917 (1979)." *State* v. *Hull,* supra.

Our examination of the record in the present case persuades us that the prosecutor did not "focus upon" or "highlight" the defendant's invocation of his right to silence. Furthermore, we conclude that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible comments by the prosecutor during his closing argument. In particular, the prosecutor only made two references to the defendant's failure to sign his transcribed statement. Clearly, these references were not the centerpiece of the state's case. Furthermore, the

defendant failed to object to the prosecutor's reference to his failure to sign his statement. The failure of an attorney to object or to move for a mistrial indicates that he did not consider the prosecutor's comments to have substantially prejudiced his client. *State* v. *Silano,* supra, 782; see *State* v. *Hull,* supra, 493.

On the present record, the prosecutor's remarks could not have played a significant role in the defendant's conviction. Prior to the state's closing argument, the jury had already been made aware of the fact that the defendant had not signed his statement. In particular, Dinello, in testifying as to the sequence of events surrounding the taking of the defendant's statement, stated that the defendant had refused to sign his statement. We have held that evidence of a defendant's silence that is not used to impeach, but rather is presented to show the investigative effort made by the police and the sequence of events as they unfolded, is not inadmissible under *Doyle* v. *Ohio,* supra. See *State* v. *Casey,* 201 Conn. 174, 183, 513 A.2d 1183 (1986); *State* v. *Moye,* 177 Conn. 487, 499, 418 A.2d 870, vacated and remanded on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on remand, 179 Conn. 761, 409 A.2d 149 (1979).[6] In addition, the defendant's statement had already been significantly impeached by the fact that, prior to making his statement, the defendant had given a contradictory version to the police of the nature of his involvement in the incident. Thus, given that the prosecutor did not "highlight" the defendant's refusal to sign his statement, that the defendant's statement had already been significantly impeached, that the jury already knew of the defendant's failure to sign his statement, and that the defendant did not object to the prosecutor's references to his

---

[6] Furthermore, the defendant conceded at oral argument that Dinello's testimony was admissible.

refusal to sign his statement, we conclude that the prosecutor's comments were harmless beyond a reasonable doubt.

## IV

Finally, the defendant argues that the trial court erred in admitting a portion of his statement that was irrelevant and unduly prejudicial. In particular, he complains that the trial court should not have permitted the jury to hear the tape recording of his statement in its entirety. Prior to its admission, the defendant moved to redact portions of the statement wherein he referred to his use of drugs and alcohol. Specifically, the defendant objected to the admission of the following portions of his statement:

"Q. Have you been in this park previous to this incident?

"A. I was there—I was there about a month ago and this—there was one other time that I was there just sitting right on the bench. I went down there with my cousin, one of my cousins one day, and we just sat there and got high, but we used to like go out there and get high because like, you know, the Police don't be messing with you out there if you like, ya know, just sitting out.

"Q. Are you in the customary habit of using either alcohol or drugs?

"A. Yes.

"Q. Which, both?

"A. Yes.

"Q. What type of drugs do you use, sir?

"A. Um,

"Q. Do you consider you an addict at this point?

"A. Yes.

"Q. How much drugs do you use on a daily average?

"A. It goes on all day and all night. Far as how much I use, I don't—I don't really, I don't really know. I just use enough to keep me—I just function off it."

The defendant argued that these portions of his statement were irrelevant and prejudical, and moved for their redaction. The trial court, however, denied his motion, noting that his statements were voluntary and relevant to show the defendant's knowledge that the area was not patrolled by the police. The defendant then duly noted his exception to the court's ruling. We were not persuaded by the defendant's disagreement with the trial court's ruling. "The court has a wide discretion in its rulings on the relevancy of evidence; *State* v. *Saia,* 167 Conn. 286, 291, 355 A.2d 88 [1974]; *State* v. *Carnegie,* 158 Conn. 264, 273, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455 [1969]; and in determining whether the probative value of the evidence outweighs its prejudicial tendency. *State* v. *Ralls,* [167 Conn. 408, 417, 356 A.2d 147 (1974)]; *State* v. *Moynahan,* 164 Conn. 560, 597, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 [1973]. 'In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. *DiPalma* v. *Wiesen,* 163 Conn. 293, 298, 303 A.2d 709 [1972]. Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. *Thomas* v. *Thomas,* 159 Conn. 477, 480, 271 A.2d 62 [1970] . . . .' " *State* v. *Carr,* 172 Conn. 458, 464, 374 A.2d 1107 (1977).

In sum, we conclude that the trial court did not abuse its discretion by admitting the challenged portions of the defendant's statement, as these portions were

indeed probative of the defendant's knowledge that the area was not patrolled by the police.

The judgment is affirmed.

In this opinion the other justices concurred.